RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANITRA COOMER,

　　　　　*Petitioner-Appellant,*

　　　*v.*

JOAN YUKINS, Warden,

　　　　　*Respondent-Appellee.*

No. 06-1235

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-72217—Nancy G. Edmunds, District Judge.

Argued: June 10, 2008

Decided and Filed: July 22, 2008

Before: GIBBONS and SUTTON, Circuit Judges; ACKERMAN, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** Mark A. Satawa, LAW OFFICES, Southfield, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Mark A. Satawa, Stuart G. Friedman, LAW OFFICES, Southfield, Michigan, for Appellant. Brian O. Neill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

---

　　　HAROLD A. ACKERMAN, Senior District Judge. Petitioner-Appellant Anitra Coomer, a Michigan state prisoner, appeals the dismissal of her petition for a writ of habeas corpus. Coomer challenges the District Court's determination that two of her confessions to murder were not obtained in violation of *Miranda*. For the following reasons, we affirm the District Court's denial of habeas relief.

---

[*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

## I.

### A. Kidnaping, Murder, and Police Investigation

On May 16, 1996, Dr. Deborah Iverson, opthamologist and mother of two, was kidnapped and murdered in her car after she left her psychiatrist's office in Birmingham, Michigan. Iverson's vehicle was found the next day, parked in a rural area of Macomb County. Inside was Iverson's body. An autopsy revealed that she had been strangled to death, and further investigation revealed that two of Iverson's checks had been cashed at two banks on the morning of her disappearance. Over seven months later, on December 30, 1996, police officers received a tip that Anitra Coomer and McConnell Adams were behind the crime.

The evidence at trial established the following circumstances of the case. Coomer and Adams lived together with their two-year-old son in an apartment in Clawson, Michigan. On May 16, 1996, their rent was overdue and they owed $480 to their day-care provider. At 9:30 a.m., Coomer and Adams dropped their son off with their provider and proceeded to Birmingham, a town about twenty miles outside of Detroit. Meanwhile, Iverson left her psychiatrist's office at 9:45 a.m., but never returned home. Nearly thirty-six hours later, the police found Iverson's Toyota Land Cruiser on the side of a highway.

Inside the car, the police found Iverson lying face down on the floor of the back seat. They found blood on the right side of her face and a line mark on her neck. Her jacket was missing a large square piece and some spots on it were faded. Iverson was clutching in her hand a picture of one of her sons. The medical examiner performed an autopsy the next day and later testified that Iverson had been dead for at least twenty-four hours at the time that her remains were discovered. The cause of death was ligature strangulation, which involved the use of some kind of noose around her neck, such as a belt. The medical examiner also testified that the ligature pattern indicated that there might have been a struggle, that the strangulation was not quick, and that it might have been agonizing.

Police did not discover any new leads until December 30, 1996. The day prior, Coomer telephoned her friend Mark Dawson, telling him that Adams had beaten her. At the time, Coomer was at the home of another friend, Anita Krawczyk. Dawson went to Krawczyk's home that afternoon, and Coomer told him about the Iverson murder. Coomer told Dawson that she and Adams had originally planned to rob Iverson, but after cashing two checks, Adams strangled Iverson with Coomer's belt. Coomer and Adams then sprayed Iverson's body and the inside of the car with bleach. Coomer told Dawson that she had not reported Adams's assault because he was holding the murder over her. Dawson later testified that Krawczyk later called the police to report the assault. When the police arrived, Coomer told them that Adams had beaten her and left in a stolen truck.

As Coomer and Krawczyk were driving to the police station to report the domestic assault, Coomer told her that she was worried about being arrested for the Iverson murder, and that she and Adams had agreed that if they were ever caught, he would take all the blame so that she could remain free to raise their son. Shortly thereafter, Adams was arrested for domestic assault.

On December 30, 1996, Dawson's attorney contacted the sheriff's department with information that Coomer was involved in the Iverson murder. Dawson later met with two officers from the sheriff's department and told them what Coomer had told him. Police officers left for Coomer's apartment later that night.

### B.       Police Arrive at Coomer's Apartment

The facts surrounding Coomer's confessions at her apartment were explored in considerable detail during an evidentiary hearing conducted by the Michigan trial court. The court summarized the testimony as follows:

> The evidence here showed that approximately nine to eleven officers were at the scene of Defendant Coomer's apartment on December 30, 1996 at about 11:45 p.m. Defendant Coomer testified that two marked cars were parked in a manner that she could observe them blocking her vehicle, while all other witnesses testified that no police vehicles were parked in a manner that Defendant Coomer could observe them out any of her apartment windows.
>
> Defendant Coomer [testified that] she had never had any prior experience with police officers and had had a friend over one to one and a half hours earlier in the evening with whom she used alcohol and marijuana. The evidence is not clear as to w[h]ether she was told that she was under arrest. Sergeant Kucyk indicated that she had been told that she was not. Defendant indicated that no one told her whether she was or not. Defendant Coomer was 20 years of age, had graduated from high school and had a 4.0 grade point average.
>
> There was extensive testimony offered by the People to establish where each officer stood, what role each officer played and where each officer parked. The testimony given by numerous officers . . . was consistent as to overall locations and roles with minor variations as to the exact location of a fellow officer's vehicle or position.
>
> Defendant testified that when she opened her door, she saw at least three uniformed officers at her door, while two plain clothes officers stepped from behind a wall. Defendant further testified that three officers entered her apartment while two remained outside her door on Detective Kucyk's instruction. The People elicited consistent testimony from the officers that placed only three officers at her door with only two plain officers – two plain clothes officers entering the apartment. Coomer testified [that] one police officer came inside only momentarily and left within minutes; thereafter leaving only Kucyk and [Sergeant] Sanborn inside the apartment when [Coomer's first confession] was made.
>
> Defendant testified that an officer accompanied her through the apartment while she searched for cigarettes during her confession. The officers testified this did not occur and Defendant had had the opportunity to walk throughout her apartment freely at all times. Finally, Defendant testified that she felt that she was in custody the moment she saw Sergeant Kucyk at her door because she had seen him on the news and knew him to be the lead detective in the Iverson homicide investigation.
>
> The evidence further showed that Defendant Coomer invited the officers into her apartment upon their request [by intercom] and shortly commenced telling them her version of what she knew about Deborah Iverson. While she . . . was not advised of her rights until about four hours later, . . . there was no physical or mental abuse of any nature exercised by the police. While Defendant testified that she had used alcohol and marijuana earlier, at least one to one and one-half hours had passed since consumption and there was no apparent signs of intoxication[;] [n]or was Defendant in ill health or deprived of sleep.
>
> When asked by the Court if she felt coerced in any way, Defendant replied "no." In fact, she gave her verbal statements to officers while weeping, suggesting remorse

but clearly without any signs of threats or coercion appearing from the testimony on
the record.

(JA at 177-78.)  In addition, Patrolman Hannah of the Clawson Police Department, who first called
Coomer on her intercom before proceeding to her apartment, had previous contact with Coomer on
matters related to domestic assault.  Kucyk testified that he told Coomer, when in her apartment, that
he and Sanborn were present to talk with her, that she was not under arrest, and importantly, that if
she asked them to leave, they would go.  Kucyk also stated that he told Coomer several times during
their discussion that she was not under arrest.

### C.        Coomer's Confessions

Once the officers were in the apartment, Coomer asked them to be quiet because her two-
year old son was asleep and offered them refreshments.  They all sat at the kitchen table, and Kucyk
indicated that he wanted to speak about Iverson.  Kucyk testified that, at that point, Coomer became
shaken, concerned, and hysterical.  Coomer asked if she could get her cigarettes from her bedroom,
which she did, and proceeded to tell the officers "the whole story."  (JA at 136.)  Coomer then
confessed her involvement in the Iverson murder.  Few questions were asked of her; most of her oral
statements were offered in a continuous narrative over the next thirty minutes.  Coomer testified that
while she cried at various points during her statements, she had otherwise calmed down once she
began to speak.  She also conceded at trial that the oral statement was voluntary, and not compelled
or coerced.

After giving this oral statement, Coomer prepared a written statement for the police.  This
written statement was later excluded by the state trial court and is not the subject of this appeal.
After writing down her statement, Sergeant Kucyk asked if Coomer would accompany him to the
sheriff's department.  Coomer agreed and was allowed to arrange for a babysitter for her son.
Coomer was transported by Sergeants Sanborn and Roberts and was provided with cigarettes and
a soda on the way to the station, arriving at approximately 3:30 a.m.

At the station, Coomer was escorted to an interview room, where Kucyk joined them.  Kucyk
had last seen Coomer about an hour earlier in her apartment.  Kucyk told Coomer that the
circumstances had changed, that she was now in custody, and that he was required to read her
*Miranda* rights.  Coomer was given *Miranda* warnings at 3:40 a.m. and was offered a waiver of
rights form dated December 31, 1996.  Coomer declined an offer of food.  Kucyk then intimated that
he wished to question her some more.  Coomer agreed and repeated her story, adding some minor
details of the crime.  This statement lasted about thirty to forty-five minutes, and Coomer
acknowledged at the trial court hearing that she waived her rights and spoke freely with the officers.

### D.        Coomer's Trial Testimony

Coomer testified at trial on her own behalf.  She said that while she and Adams planned to
rob a woman, she did not expect anyone to get hurt and that Adams made all the decisions.  She
stated that Adams noticed the Land Cruiser, checked its parking meter, looked inside, and saw
certain items likely to be in a woman's possession. When Iverson approached her car, Adams placed
a BB gun to Iverson's back and forced her into her car.  According to Coomer, when Adams asked
for Coomer's belt, he said that he was just going to tie up Iverson.  After giving him the belt,
Coomer went into the Arbor drug store.  When she returned, she resumed driving and did not look
in the back seat.  When she stopped at a stop sign, Coomer looked in the rearview mirror and saw
that Adams was no longer kneeling over Iverson on the floor, but was sitting in the back seat.
"Anitra," Adams said, "it's done.  It's over."  Coomer testified that she then began to cry.

According to Coomer, Adams told her to drive home, where Adams picked up another vehicle. They then drove out to Macomb County and left Iverson's lifeless body in her car on the side of a highway. On December 31, 1996, police officers executed a search warrant at Coomer's apartment and found her black leather coat with belt loops, but no belt, and a spray bottle of bleach under the sink.

### E.     Procedural Background

Coomer was tried jointly with Adams but before separate juries in Michigan's Circuit Court for the County of Oakland. The trial court excluded Coomer's written confession made in her apartment on the ground that it violated *Miranda*. However, the trial court permitted the admission of her two oral confessions: the first at her apartment, the other at the police station. The jury found Coomer guilty of two counts of first-degree murder, and one count of kidnaping. The trial court sentenced Coomer to life imprisonment for the murder and fifteen to sixty years for the kidnaping. The Michigan Court of Appeals vacated Coomer's kidnaping conviction on double jeopardy grounds and affirmed Coomer's murder conviction.[1] Coomer appealed to the Michigan Supreme Court but was denied leave to appeal. *See People v. Coomer*, 465 Mich. 894 (2001) (table).

Coomer filed her federal habeas corpus petition in the Eastern District of Michigan on June 15, 2004.[2] Among other arguments, Coomer contended that her first oral confession in her apartment was taken in violation of *Miranda*, and that her confession at the police station was insufficiently removed from the taint of the *Miranda* violation arising from her written confession in her apartment. The District Court denied Coomer's petition, finding that the state courts' conclusions "were *not* entirely unreasonable" inasmuch as they held that Coomer's oral confessions were lawfully obtained. (JA at 83 (emphasis added).) The District Court had jurisdiction pursuant to 28 U.S.C. § 2254, and this Court exercises jurisdiction under 28 U.S.C. § 1291.

## II.

### A.     Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, placed "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Coomer's petition for a writ of habeas corpus may be granted only if she can show that the state court's adjudication of her claims on the merits:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[1]While not relevant to our Opinion, we note that the Court of Appeals vacated Coomer's kidnaping conviction because "defendant's convictions and sentences for both felony murder and the underlying felony of kidnaping violate her right against double jeopardy." (JA at 139.)

[2]The named appellee, Joan Yukins, was the warden of Coomer's state correctional facility at the time that Coomer filed suit, and is represented by the State of Michigan.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. Conversely, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court need not cite Supreme Court cases on point or even be aware of such cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)). This review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane*, 489 U.S. 288, 310 (1989), unless an intervening decision of constitutional import announces a "watershed" rule of criminal law with implications for the fundamental fairness of the trial proceeding, *Caspari v. Bohlen*, 510 U.S. 383, 396 (1994). This Court reviews the District Court's legal conclusions *de novo*. *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001).

Coomer made three confessions to the police. While the state trial court excluded Coomer's written confession made at her apartment, the court admitted Coomer's oral statements made at her apartment and at the police station. We will thus examine only the admission of Coomer's two oral statements because the exclusion of her written confession in her apartment is not raised in this appeal.

## B. The Oral Confession at Coomer's Apartment

### 1. State Court Decisions

The state trial court permitted Coomer's oral confession at her apartment to be admitted at trial. It reasoned that Coomer "was in her own apartment in the presence of another individual known to her," and that the "questioning was minimal and brief." (JA at 179.) It concluded that a reasonable person would not have felt like he or she was in custody, and thus, the police were not required to issue a *Miranda* warning. The Michigan Court of Appeals reached the same conclusion:

> The evidence showed that defendant permitted the police officers to enter her apartment building and permitted [them] to enter her apartment. . . . The officers did not display weapons, and Kucyk indicated that he informed defendant several times that she was not under arrest. Kucyk also told defendant that if she wanted them to leave, they would go. . . . Defendant proceeded to give a statement, largely in narrative form, with little police questioning. She fully acknowledged that she was not compelled or coerced to give a statement.

(JA at 137.) Thus, the court held that "the totality of the circumstances indicates that Coomer was not in custody at her apartment." (JA at 137.)

### 2. Supreme Court Precedent

We begin by determining the relevant, clearly established law. We must ascertain, *de novo*, whether the state court decisions concerning Coomer's first oral statement were contrary to, or an unreasonable application of, Supreme Court precedent. For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The Fifth Amendment to the Constitution states that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  In the seminal case of *Miranda v. Arizona*, the Court held that pre-interrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings."  384 U.S. 436, 458 (1966).  The Court defined "custodial interrogation" to include any circumstance where a suspect "deprived of his freedom by the authorities in any significant way and is subjected to questioning[.]"  *Id.* at 478.  However, the Court did not have occasion to apply that test to a set of facts.

In succeeding cases, the Court has fleshed out the relevant law concerning the circumstances under which a suspect may be considered in custody.  In *Berkemer v. McCarty*, the Court instructed that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  468 U.S. 420, 442 (1984).  "A policeman's unarticulated plan has no bearing on the question [of] whether a suspect was 'in custody' at a particular time[.]"  *Id.*  The Court elaborated further in *Stansbury v. California*, which was cited and relied upon by the Michigan Court of Appeals in this case.  511 U.S. 318 (1994).  In *Stansbury*, the Supreme Court explained that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Id.* at 323.

Subsequent to *Stansbury*, the Supreme Court framed the proper inquiry as involving two essential questions: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The Court directed that "[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Id.*

The Sixth Circuit added further guidance on the custody determination in *United States v. Salvo*, where this Court explained that courts should consider the following factors:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

133 F.3d 943, 950 (6th Cir. 1998).

### 3.    Analysis

For the following reasons, we conclude that the state court decisions were not unreasonable, and that Coomer's oral confession in her apartment was properly admitted.  Examining the totality of the circumstances, and mindful of the *Salvo* factors, the evidence at trial showed that a reasonable person would not have ultimately felt that his or her freedom was restrained in a manner associated with a formal arrest.  At the outset, we recognize that some facts could support a custodial determination.  For instance, Coomer testified that the police arrived at a late hour; that police cars blocked her vehicle on her driveway; that up to eleven officers, uniformed and plain-clothed, came to Coomer's building; and that the purpose of the police questioning was, as Coomer alleges, to focus the investigation on Coomer herself.  However, that the police did not already have probable

cause to arrest Coomer is immaterial to our analysis here, because "any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*." *Stansbury*, 511 U.S. at 326. More importantly, no one factor is "dispositive of the custody issue." *Id.* at 325.

Other material facts support the state courts' decisions. First, Coomer voluntarily allowed the police into her apartment building and was questioned in her own home. While an interrogation in one's home is not determinative alone of the custodial inquiry, it is usually indicative of the absence of the isolation inherent in custodial interrogations. *See Beckwith v. United States*, 425 U.S. 341, 346 n.7, 347 (1976) (finding that the suspect, who was questioned in his home, "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding[,]" because *Miranda* concerned "the principal psychological factor" of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner'") (quoting *Miranda*, 384 U.S. at 457).

Second, Coomer's confession lasted only thirty minutes, taking the form primarily of a narrative and prompted by little police questioning. This fact suggests that Coomer was relieved to discuss her role in a murder after more than six months of avoiding the authorities. The trial court also noted that Coomer's teary demeanor reinforced the impression that Coomer exuded remorse, and we add that the merely intermittent police questioning and Coomer's narrative confession suggest an act born of free will, not an act born of coercion. In other words, if Coomer was coerced, it was not by the police, but by her conscience.

Third, and perhaps most significantly, Kucyk testified that he told Coomer several times that she was not under arrest and that the police would leave if asked. *See Salvo*, 133 F.3d at 951 (acknowledging that one of the most important factors in the custody inquiry is whether an officer explicitly informs a suspect that he or she is not under arrest). The state court's adjudication cannot be unreasonable where "no governing precedent of the Supreme Court or . . . court of appeals [decision] that can be located . . . holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning."[3] *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004); *see also United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("[A]dvising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody[.]") (emphasis in original); *Salvo*, 133 F.3d at 950 (recognizing that a statement by an officer to a suspect that he was "free to leave at any time . . . is an important factor in finding that the suspect was not in custody.").

To be sure, Coomer testified that her subjective belief was that she was not free to leave, but the Supreme Court has repeatedly instructed courts to dismiss a suspect's subjective thoughts. *See, e.g.*, *Stansbury*, 511 U.S. at 323. At the same time, Coomer conceded at trial that her confession was not coerced or compelled. (JA at 420.) Coomer moved freely around her apartment, offered the officers refreshments, and told the officers to stay quiet out of respect for her sleeping son. These

---

[3] At oral argument, Coomer's counsel stressed the distinction between a suspect being told that she is "free to leave," and a suspect being told that *the officers would leave* if asked. Coomer's novel distinction is one without a difference. Of course, when the officers are present *in a suspect's home*, the more appropriate inquiry is not whether the suspect feels free to leave, *per se*, but rather, whether the police will terminate questioning if asked to leave, as the *Czichary* court suggests. *See* 378 F.3d at 826 ("That a person is told repeatedly that he is free to *terminate an interview* is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.") (emphasis added); *see also Salvo*, 133 F.3d at 950 (impressing that one factor for a court to consider in the custody inquiry is whether a suspect was "free to leave *or to request the officers to do so*") (emphasis added); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) ("[The Officer] repeatedly told the defendants that they were not under arrest and that they were *free to cut off his questioning* at any point.") (emphasis added). Similarly, that Coomer was told repeatedly that the police would leave if asked is powerful evidence that a reasonable person would have understood that she was free to ask the police to leave and terminate the questioning.

facts imply that Coomer exercised control over her surroundings in her own home, not that *she* was controlled by her interrogators, as was the concern in *Miranda*. *See Miranda*, 384 U.S. at 457. Viewing the totality of the circumstances, we find that the state courts' decisions that a reasonable person would not have felt in custody in Coomer's situation were not unreasonable applications of the relevant, clearly established law.

Coomer argues that this Court should proceed directly to a harmless error analysis because she presupposes that she was in custody prior to her first confession. She contends that the District Court "held that Ms. Coomer was in custody at the time of the first half of her initial confession, and therefore in violation of *Miranda*[,]" but that despite this violation, the court found the error harmless because, in the District Court's words, it did not have a "'substantial and injurious' effect" on the jury's verdict. (Appellant's Br. at 44 (quoting JA at 85).)

Coomer profoundly misconstrues the District Court's holding. The District Court held that "[t]he question of custody is a close one, and the state courts' conclusions were not entirely unreasonable." (JA at 83.) However, Coomer appears to be relying on dicta set forth earlier in the District Court's ruling, where it wrote that "[t]he objective circumstances of the interrogation lead the Court to conclude that Petitioner was in custody and should have been advised of her constitutional rights before she made her first statement." (*Id.*) To the extent that the District Court opined that Coomer was in custody during her first statement, this Court does not share that perspective for the purposes of our limited review under AEDPA.

As the Supreme Court has explained, and the District Court below accurately echoed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous.") (internal quotations omitted). The standard of review is limited to determining whether, "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated," *Williams,* 529 U.S. at 389, by virtue of a state court's "objectively unreasonable" application of Supreme Court precedent, *Bell v. Cone*, 535 U.S. 685, 699 (2002).

The state courts' decisions finding that Coomer's first oral confession was not obtained in violation of *Miranda* were not unreasonable applications of Supreme Court precedent. No governing Supreme Court decision has held that a defendant in Coomer's circumstances – where she was told that she was not under arrest and that the police would leave if asked – was in custody for purposes of *Miranda*. We affirm the District Court's holding concerning Coomer's first oral confession.[4]

### C.      Coomer's Oral Confession at the Police Station

While we conclude that Coomer's first oral statement was admissible, we proceed to examine whether Coomer's confession at the police station was properly made insofar as it relates to Coomer's intervening *second* confession, which the state courts found was obtained in violation of

---

[4]Harmless error analysis applies to coerced confessions. *Ariz. v. Fulminante*, 499 U.S. 279, 295 (1991). Because we affirm the District Court's holding regarding Coomer's first confession, we need not reach Coomer's argument that the admission of this confession had a substantial and injurious effect in determining the jury's verdict. *Cf. Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005) (engaging in harmless error analysis after finding confrontation clause error).

*Miranda.*[5]  *See United States v. Gale*, 952 F.2d 1412, 1417 n.8 (D.C. Cir. 1992) (analyzing admissibility of the defendant's fourth statement "only as it relates to his second and third statements" because there was no *Miranda* violation involved with the first statement).

### 1.      State Court Decisions

Both state court decisions found that Coomer's oral confession at the police station was admissible.  The trial court determined that Coomer was properly Mirandized prior to her confession, and that no evidence suggested undue coercion by the police to obtain a waiver of her rights.  The Michigan Court of Appeals went further, agreeing that Coomer had been properly Mirandized, and also holding that Coomer's confession was sufficiently disconnected from the prior unlawful written statement made by Coomer in her apartment:

> Here, defendant was in custody at the police station, she was fully advised of her *Miranda* rights, and she waived those rights.  Defendant's contention that a reasonable person would not have felt at liberty to terminate the second oral statement is simply not supported by the record.  There is no indication that the second oral statement given at the police station was obtained illegally or involuntarily.
>
> Further, the second oral statement given at the police station was not fruit of the poisonous tree based on the contention that the written statement given at defendant's apartment should have been preceded by *Miranda* warnings.  Suppression of the oral statement given by defendant at the police station would not be appropriate absent a causal connection between that statement and the earlier, improperly written statement. . . .
>
> [T]here was a time lapse of approximately three hours between the written statement made at the apartment and the second oral statement at the police station. . . .  At the police station, defendant was properly advised of her *Miranda* rights before giving her second oral statement.  Under these circumstances, the statement given at the police station is *sufficiently disconnected from the prior written statement that the later oral statement cannot be considered the fruit of the poisonous tree.*

(JA at 138 (emphasis added).)  Thus, the Michigan Court of Appeals found no error in the trial court's admission of Coomer's second oral confession.

### 2.      Supreme Court Precedent

Coomer maintains that her confession at the police station was tainted by her earlier, improper written confession in her apartment.  The Supreme Court spoke directly to this circumstance in *Oregon v. Elstad*:

---

[5]The trial court found that Coomer's written confession had immediately followed her verbal confession, and thus, "a reasonable person who had just orally implicated herself in a crime of this nature who sits down to put that implication in writing at the request of an officer would not reasonably think that they would be free to leave." (JA at 180.)

At oral argument, counsel for Coomer focused extensively on the seeming incongruity between the Michigan trial court's determination that Coomer's first confession in her apartment was lawfully obtained, while her second, written confession just moments later was not.  We do not review the lawfulness of Coomer's written confession here.  However, we note that the trial court's reasoning to exclude Coomer's written confession best encapsulates our view of the operative distinction between the oral and written confessions in Coomer's apartment.

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, *the admissibilty of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made.*

470 U.S. 298, 309 (1985) (emphasis added).

*Elstad* involved a young suspect who was interrogated without being Mirandized by police in his home, where he first confessed to a crime. After the suspect was taken to the police station and given proper warnings, he again confessed. The suspect argued at trial that his second confession should not be admitted because it was the fruit of the first tainted confession. The Supreme Court refused to adopt the suspect's "cat out of the bag" theory and held that "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310-11. The Supreme Court reasoned that the change in location and circumstances, and the lack of any evidence suggesting that the police exploited the suspect's unwarned admission to secure the second, supported its finding that the suspect's waiver of his rights was freely given. Thus, the Court held that the second confession was not tainted by the first confession.

In deciding whether a second confession has been tainted by the prior coerced statement, the Supreme Court instructed courts to consider "the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators[.]" *Id.* at 310. A plurality of the Court recently elaborated on these factors, directing courts to examine "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Missouri v. Seibert*, 542 U.S. 600, 615 (2004) (plurality opinion); *see also id.* at 622 (Kennedy, J., concurring) (stating that *Elstad* controls absent a deliberate evasion of *Miranda* by the police).

### 3.      Analysis

We find that the state courts' decisions that Coomer's second confession was lawfully obtained were not unreasonable applications of Supreme Court precedent. As the Michigan Court of Appeals held, we conclude that there is "no indication that the second oral statement given at the police station was obtained illegally or involuntarily." (JA at 138.) At the police station, Coomer was offered food, and she acknowledged at the trial court hearing that she waived her rights and spoke freely with the officers. Her *Miranda* warnings were complete, and the record before us supports the conclusion that Coomer's waiver was knowing and voluntary.

Coomer argues that her police station confession was tainted by her earlier, unlawfully obtained written confession. The Michigan Court of Appeals addressed this question, and noted several factors in finding that the second confession did not need to be suppressed: the time lapse of approximately three hours between the written statement in Coomer's apartment and her confession at the police station; the absence of coercive police conduct; the change in location; the voluntary nature of her first oral statement that immediately preceded the unlawful written confession; and her waiver of rights at the police station.

We agree with the Michigan court. Like the suspect in *Elstad*, Coomer was administered complete *Miranda* warnings and offered her second oral confession in different circumstances than those surrounding her written confession. Kucyk testified that, once they arrived at the police

station, he told Coomer that the circumstances had changed, that she was now in custody, and that he was required to read her *Miranda* rights. While Coomer offered much of the same story as she discussed at her apartment, and the police personnel remained largely the same, several hours had passed since her first oral confession, Coomer was confined in the police station, and, crucially, Coomer had been Mirandized. *See Elstad*, 470 U.S. at 314 ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."). Even under the *Seibert* plurality's test, a reasonable person in Coomer's shoes "could have seen the station house questioning as a new and distinct experience," and "the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." 542 U.S. at 615-16.

Coomer relies on *Seibert* to argue that Coomer's second oral confession was tainted by her unlawfully obtained written confession to the extent that her police house confession must be found involuntary. In *Seibert*, *Miranda* warnings given mid-interrogation, after the suspect gave an unwarned confession, were found ineffective, 542 U.S. at 617 (plurality opinion), because the police employed a "technique . . . designed to circumvent *Miranda*," *id.* at 618 (Kennedy, J., concurring). In any event, the District Court here distinguished the facts of *Seibert*: "Unlike the coordinated and continuing interrogation in *Seibert* where *Miranda* warnings were given midstream, [Coomer's] statement at the Sheriff's Department was subject to independent evaluation." (JA at 88.) We agree. Coomer's new circumstance at the sheriff's department "placed [her] in a position where she could make an informed choice about whether to waive her constitutional rights." (*Id.*) Indeed, she was in a new location (at the station instead of in her home), there had been a break in time between the two statements (the written confession was made at approximately 12:30 a.m., the station confession at about 3:40 a.m.), and Kucyk specifically informed her that she was in custody (in direct contrast to being told that the officers would leave if asked). Thus, unlike the suspect's latter statement in *Seibert*, Coomer's police station confession was "sufficiently disconnected from the prior written statement[.]" (*Id.* at 138.) Furthermore, the substantial similarity between Coomer's *voluntary* oral confession in her home and the oral confession at the police station makes it questionable whether the intervening, improper written confession could have had any causal effect on the voluntariness of the subsequent police house statement. *Cf. United States v. Perdue*, 8 F.3d 1455, 1469 (10th Cir. 1993) (examining whether later confessions were the "involuntary products" of an earlier, improper confession). That the state courts admitted Coomer's police station confession thus was not unreasonable.

Coomer argues that "the District Court clearly erred in applying the facts of this case to the multi-factor test" set out in *Elstad* and *Seibert*. (Appellant's Br. at 38.) However, we review not whether the *District Court* erred, but whether the *state court* decisions constituted *unreasonable* or *contrary* applications of Supreme Court precedent. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 413. For the foregoing reasons, we cannot find that they were. It was not an unreasonable determination of the facts to conclude that Coomer's waiver was knowing and voluntary when made, nor an unreasonable or contrary application of Supreme Court precedent to hold that her second confession was sufficiently disconnected from the taint of Coomer's excluded written confession.

### III.

We AFFIRM the District Court's denial of Coomer's petition for a writ of habeas corpus.