# IN THE COURT OF APPEALS OF IOWA

No. 3-1096 / 12-2319
Filed February 5, 2014

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**ADAM WAYNE UNDERWOOD,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Des Moines County, Mark E. Kruse, District Associate Judge.

       A defendant appeals his conviction and sentence for serious domestic abuse assault.  **AFFIRMED.**

       Mark C. Smith, State Appellate Defender, Martha J. Lucey, Assistant Appellate Defender, and Jason M. Groth, Student Legal Intern, for appellant.

       Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, Patrick C. Jackson, County Attorney, and Luke Hansen, Assistant County Attorney, for appellee.

       Heard by Vogel, P.J., and Tabor and McDonald, JJ.

**TABOR, J.**

Adam Underwood contends he was in custody when questioned in his apartment by police officers who were let in by his live-in girlfriend to investigate her complaint he repeatedly punched her. That contention is the primary basis of Underwood's appeal from his conviction for serious domestic abuse assault. He argues his trial counsel was ineffective for withdrawing a motion to suppress his statements. He asserts the statements were inadmissible because of a *Miranda*[1] violation and because they were not voluntary. He also argues the district court abused its discretion by not giving a reason for imposing consecutive sentences.

We find Underwood was not in custody at the time of questioning and his statements were voluntary. Therefore, his counsel was not ineffective in withdrawing the motion to suppress. We also find the district court gave reasons for imposing consecutive sentences. Accordingly, we affirm.

**I.      Background Facts and Proceedings**

By the summer of 2012, Lenora Trull and Adam Underwood had been in a relationship for six years. They had lived together at 927 North English Street in Burlington for the last two years.

Trull testified she spent the evening of July 27, 2012, drinking with Underwood until they both fell asleep. In the early morning of July 28, Trull awoke to Underwood trying to strangle her. He also punched her nine or ten times. Trull tried to leave, but Underwood refused to let her go.

According to Trull, it was not until Underwood had fallen back asleep that she was able to leave and call her friend Dustina Fenton at 3:30 or 4:00 p.m. on

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 473–76 (1966).

July 28. Trull met Fenton at Fenton's apartment, and Fenton called the police. Trull suffered a broken rib, an eye contusion, and bruises to her arms, legs, back, and face.

Burlington Police Officer Tim Merryman responded to Fenton's call. Trull told the officer that Underwood had assaulted her. Merryman photographed her injuries and interviewed her. She told the police where she and Underwood lived. Officer Merryman and three other officers went to the apartment, where Trull let them in through an unlocked door. Trull testified she "opened the door and immediately went back downstairs to Dustina's."

The officers did not knock, and Merryman could not remember if they announced their presence. Officer Merryman and another officer entered the living room where Underwood was asleep on the couch. The other two officers waited in the kitchen. Officer Merryman woke Underwood and told him why the police were in his apartment. Merryman asked Underwood what had happened. Initially, Underwood said nothing had happened. Then he told Merryman that Trull had been to another residence and when she came back her "pants were ripped and that she said she had been assaulted by two black males."

Officer Merryman advised Underwood that Trull had told the police something "totally different" and her injuries were consistent with her story. Then Underwood admitted to Merryman he had punched Trull "about four times." When asked why, Underwood said when he is intoxicated he "does things he won't normally do." The officers then arrested Underwood. Officer Merryman

estimated the whole police action—entering the apartment, questioning Underwood, and arresting him—took between five and ten minutes.

On August 2, 2012, the State charged Underwood with serious domestic abuse assault, in violation of Iowa Code sections 708.2A and 236.2 (2011), and false imprisonment, in violation of section 710.7. On September 25, 2012, defense counsel filed a motion to suppress alleging the police illegally entered his apartment and questioned him in violation of his *Miranda* rights. A hearing on the motion to suppress was set for October 5, 2012, and the previously scheduled pretrial conference was continued from September 27 to October 5. Underwood, through counsel, withdrew the motion to suppress on October 3.

A jury trial commenced on October 24, 2012. The next day, the jury found Underwood guilty of serious domestic abuse assault but found him not guilty of false imprisonment. The district court sentenced Underwood to one year in prison to run consecutively to the sentence he was already serving for operating while intoxicated. He now appeals.

## II.    Standard of Review

We review claims of ineffective assistance of counsel de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). We review sentencing decisions for an abuse of discretion. *State v. Barnes*, 791 N.W.2d 817, 827 (Iowa 2010). We are unable to review for an abuse of discretion where the sentencing court does not provide reasons for imposing consecutive sentences. *See State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000) ("Although the reasons need not be detailed, at

least a cursory explanation must be provided to allow appellate review of the trial court's discretionary action.").

## III. Analysis

### A. Did Underwood receive ineffective assistance of counsel?

To establish his claim of ineffective assistance of counsel, Underwood must satisfy a two-prong test, showing: (1) counsel failed to perform an essential duty and (2) prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). If either prong is unsatisfied, we affirm. *Anfinson v. State*, 758 N.W.2d 496, 499 (Iowa 2008). "In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010). Under the duty prong of *Strickland*, "we measure counsel's performance against the standard of a reasonably competent practitioner." *Id.* at 158. We presume the attorney performed his duties competently. *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012). Underwood can successfully rebut this presumption by showing a preponderance of the evidence demonstrates counsel failed to perform an essential duty. *See id.* In deciding whether counsel failed to perform an essential duty, we measure trial counsel's performance "'objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances.'" *Clay*, 824 N.W.2d at 495 (quoting *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010)).

To prove prejudice, Underwood must show that, but for counsel's unprofessional errors, it is reasonably probable the result of the proceeding

would have been different. *State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012). If the defendant asks us to decide the claim on direct appeal, we must determine if the record is adequate to resolve the issue. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

Underwood argues his counsel breached an essential duty by withdrawing the motion to suppress because he confessed to police without the benefit of *Miranda* warnings and the statements were involuntary. We address each of these claims in turn.

### B. Was Underwood in custody when questioned in his apartment?

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* warnings are necessary when police have placed a restriction on a person's freedom to the extent that he is rendered "in custody." *Id.* To determine if a person is in custody, we examine the totality of circumstances surrounding the interrogation, but the ultimate inquiry is whether police made a formal arrest or restrained the person's freedom of movement to the degree associated with a formal arrest. *State v. Countryman*, 572 N.W.2d 553, 557–58 (Iowa 1997). The custody determination does not rise and fall on the subjective views of either the officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994). Rather, we look to the objective circumstances of the interrogation and ask whether a reasonable person in the defendant's position would have understood himself to be in custody. *Countryman*, 572 N.W.2d at 558.

In *Bradley v. State*, 473 N.W.2d 224, 228 (Iowa Ct. App. 1991), *overruled on other grounds by Dykstra v. Iowa Dist. Ct.*, 783 N.W.2d 473 (Iowa 2010), our court first determined that "along with considering the totality of circumstances" it was helpful in the custody determination to apply a four-factor test set out in *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978). Those factors are as follows:

> (1) the language used to summon the individual;
> (2) the purpose, place, and manner of interrogation;
> (3) the extent to which the defendant is confronted with evidence of [his] guilt; and
> (4) whether the defendant is free to leave the place of questioning.

*State v. Deases*, 518 N.W.2d 784, 789 (Iowa 1994) (considering custodial interrogation in prison setting).

Iowa courts have used these same factors to help decide if someone is in custody in various locations. *See, e.g., State v. Bogan*, 774 N.W.2d 676, 681-82 (Iowa 2009) (school office); *State v. Ortiz*, 766 N.W.2d 244, 252 (Iowa 2009) (outside of third party's home and at police station); *State v. Miranda*, 672 N.W.2d 753, 759-60 (Iowa 2003) (defendant's home); *State v. Trigon,* 657 N.W.2d 441, 444 (Iowa 2003) (suspect's office); *State v. Astello*, 602 N.W.2d 190, 195-96 (Iowa Ct. App. 1999) (law enforcement center). No one particular factor is determinative of the custody issue. *State v. Smith*, 546 N.W.2d 916, 922 (Iowa 1996).

The general rule is "in-home interrogations are not custodial for purposes of *Miranda*." *State v. Evans*, 495 N.W.2d 760, 762 (Iowa 1993); *see also United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998) (collecting federal precedents); *accord Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (citing *Beckwith v.*

*United States,* 425 U.S. 341, 346 n.7, 347 (1976) (finding suspect, who was questioned in his home, "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding[,]" because *Miranda* concerned "the principal psychological factor" of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner'")).

A suspect may be deprived of his or her freedom in places other than a police station. *See United States v. Griffin*, 922 F.2d 1343, 1355 n.15 (8th Cir. 1990) (noting while it is "accepted logic that interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody," it is also possible "to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence"); *see also Orozco v. Texas*, 394 U.S. 324 (1969) (finding suspect in custody even though in his home); *Miranda*, 672 N.W.2d at 760–61 (finding custody where suspect was handcuffed and deprived of the "usual comforts of home"). Therefore, we must look to the totality of the circumstances in the case before us.

**1.     The language used to summon Underwood.**

The police did not summon Underwood. They found him asleep on his living room couch after being let into the home by Trull.

**2.    The purpose, place, and manner of questioning.**

The purpose of the questioning was simple.    The officers were investigating a reported assault.  Underwood was the alleged attacker, and the police were seeking his side of the story.

The questioning took place in the late afternoon in Underwood's living room.  The location is highly significant.  As the Sixth Circuit observed, the home is

> presumably . . . the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave.

*United States v. Panak*, 552 F.3d 462, 465–66 (6th Cir. 2009).  The *Panak* court continued:

> It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors.  No doubt, some individuals may find it more difficult to do these things during a visit by the police.  But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

*Id.*

Underwood was in the comfort and security of his own home when he awoke to find the police in his living room.  He did not ask the police to leave after they told him why they were there.  Officer Merryman said Underwood was not groggy and was able to answer questions coherently once he awoke.

According to Merryman's testimony, the manner of the questioning was civil.  Two officers were in the living room with Underwood while two other officers waited in the kitchen.  Trull did not enter the apartment with the officers.

Underwood was not handcuffed during the questioning. The officers did not draw their weapons. Merryman testified he spoke to Underwood in a voice like the one he used while he was testifying. The officer also testified he did not stand over Underwood in an imposing manner. The whole encounter from arrival to arrest lasted between five and ten minutes.

### 3. The extent to which Underwood was confronted with evidence of his guilt.

The police told Underwood that Trull had accused him of assaulting her. Officer Merryman asked Underwood what happened. At first Underwood denied anything had happened. Then he blamed others for her assault. When Merryman confronted Underwood with Trull's version of events and her corroborating injuries, Underwood admitted punching her several times because he had been drinking.

### 4. Was Underwood free to leave?

During the questioning, the police did not tell Underwood he was under arrest but also did not tell him he was free to leave or free to ask them to leave.

### 5. Totality of circumstances.

Underwood contends his case is like *Miranda*, 672 N.W.2d at 759, where our supreme court found an in-home interview to be custodial. He emphasizes that several armed officers were present in his apartment when he awoke and confronted him with evidence of his guilt. Granted, "[a]ny reasonable, innocent person would likely feel surprised or even feel panic if awakened from a sound sleep and questioned by a police officer." *People v. Brown*, 764 N.E.2d 562, 570 (Ill. App. Ct. 2002). But that element of surprise does not mean, as a natural

consequence, the person would reasonably believe he was in police custody. *Id.* We do not find the presence of four officers or the line of questioning converted Underwood's encounter into a custodial situation. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. Here, the interview was very brief, and the two officers who confronted Underwood did not draw their weapons or otherwise intimidate him.

We do not find *Miranda* to be controlling here. In that case, the police officers encountered the suspect in his bedroom and brought him to the living room, where they handcuffed and questioned him. *Miranda*, 672 N.W.2d at 760. Handcuffing was the critical fact indicating Miranda was not free to leave. *Id.* Because police did not direct Underwood's movement around the apartment or place him in handcuffs, we find he was not in custody during the brief interrogation.

In a situation similar to ours, a New Jersey court found a suspect was not in custody. *State v. Smith*, 864 A.2d 1177, 1181 (N.J. Super. Ct. App. Div. 2005). Smith's wife called the police to her house and told them her husband had strangled her and thrown her against the wall. *Id.* at 1179. The court found:

> The questioning was brief, lasting a matter of moments. The questions were related to dispelling or confirming the officer's suspicion that defendant had choked and pushed his wife and were neither harassing nor intimidating. While one of the two questions directly presented facts reported by defendant's wife, the question was not a stratagem or phrased to coerce an admission by suggesting the officer had reached a conclusion about the veracity of the information. The officer's position at the side of defendant's

bed and his protective use of the flashlight momentarily restricted defendant's movement, but no more so than a protective frisk during a *Terry* stop. The officer did not touch defendant or ask him to move, to get up or to stay still, and he did not tell defendant he was under arrest.

*Id.* at 1183 (internal citations omitted); s*ee also State v. Herting*, 604 N.W.2d 863, 865 (S.D. 2000) (asking domestic abuse suspect in a bedroom "What happened tonight?" was not custodial interrogation).

Because Underwood was not in custody at the time of the questioning, there was no point in pursuing a motion to suppress on that basis. *See State v. McPhillips*, 580 N.W.2d 748, 754 (Iowa 1998). Trial counsel is not ineffective in failing to urge an issue that has no merit. *Id.; State v. Crone*, 545 N.W.2d 267, 270-71 (Iowa 1996). Therefore, Underwood's attorney did not provide ineffective assistance by withdrawing the motion to suppress his un-Mirandized statements.

**C.     Were Underwood's statements voluntary?**

The determination of voluntariness depends on the totality of the circumstances. *State v. Buenaventura*, 660 N.W.2d 38, 46 (Iowa 2003). The general rule is that "[s]tatements are voluntary if they were the product of an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992). This is often judged by:

> the defendant's age; the level of the defendant's prior experiences with law enforcement; whether the defendant was intoxicated at the time of the statement; whether the defendant was provided *Miranda* warnings; the intellectual capacity of the defendant; whether officers acted in a deceptive manner; whether the defendant appeared to understand and respond to questions; the length of

time of the detention and interview; the defendant's physical and emotional reaction to the interrogation; and whether the defendant was subjected to any physical punishment such as the deprivation of food or sleep.

The Supreme Court has also considered characteristics such as the defendant's age; physical fatigue; mental deficiency; [and] level of education . . . .

*Buenaventura*, 660 N.W.2d at 47.

We again look to the totality of circumstances. Underwood was thirty-four at the time of his arrest. The record does not show he had any mental deficiencies. Underwood was not given *Miranda* warnings but had previous experience with the criminal justice system and was on probation at the time of the interrogation. Although Underwood had been drinking the previous night, officers found him lucid when they woke him up in the afternoon. The officers used no physical restraint and made no promises of leniency or threats toward him.[2] Questioning lasted less than ten minutes. Based on our review of the circumstances of Underwood's questioning and his relevant personal factors, we conclude his statements were made voluntarily, a product of his free will, and unburdened by coercion. Accordingly, counsel had no basis to move to suppress under the Fifth Amendment to the Federal Constitution.

### D. Analysis under Iowa Constitution.

We do not have a separate provision in our state constitution that protects an individual against self-incrimination. Instead, Iowa courts have interpreted Article I, Section 9 of the Iowa Constitution as incorporating that right. *See State*

---

[2] Underwood argues as part of his voluntariness claim that the officers' entry into the apartment was a Fourth Amendment violation. We disagree. The record showed Trull lived with Underwood in the apartment and had common authority to give access to the police. *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (stating co-inhabitants have the right to permit search of common area).

*v. Baldon*, 829 N.W.2d 785, 811 (Iowa 2013); *State v. Height*, 91 N.W. 935, 938 (Iowa 1902). Underwood contends the due process language of the Iowa Constitution[3] protects against involuntary statements to police. He lobbies for an "inform-then-ask" standard, requiring the police to give the person being questioned information so he or she can make "a knowing and meaningful choice in a potentially intimidating and coercive situation." He contends if suspects are not told they are free to leave or terminate questioning in a noncustodial interrogation, admission of their statements violates the state constitution.

Underwood advocates adopting and adapting the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) to ensure "fairness" under Iowa's due process clause. That case provides:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

We understand state appellate courts have the final word on their state constitutions. *See Baldon*, 829 N.W.2d at 790. We also recognize our supreme court has on occasion noted its prerogative under the Iowa Constitution to apply a standard "more stringently" than federal case law. *See State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009). But even if we, as an intermediate appellate court, could stray from the

---

3 "No person shall be deprived of life, liberty, or property, without the due process of law." Iowa Const. art. I, § 9.

federal analysis, we would be reluctant to read Article 1, Section 9 of our state constitution as incorporating the *Mathews* balancing test. The balancing test from *Mathews* is generally used to determine whether a person has been afforded procedural due process in civil cases and is rarely applied in the criminal context. *See Medina v. California*, 505 U.S. 437, 444 (1992). When it comes to criminal procedure, the due process question is more narrowly framed in terms of fundamental fairness. *See State v. Becker*, 818 N.W.2d 135, 152 (Iowa 2012).

Underwood cites no cases from Iowa or elsewhere that deem it fundamentally unfair to allow into evidence statements made to police by a defendant who is not in custody in the absence of an advisory that the suspect was free "to leave or end police questioning." In the absence of any suggestion such a requirement could become the law reasonably competent defense counsel could not have determined the issue was worth raising in a motion to suppress. *See State v. Kehoe*, 804 N.W.2d 302, 312 (Iowa Ct. App. 2011) (finding no ineffective assistance of counsel where argument was not worth raising under existing precedents).

### E. Sentencing.

Finally, Underwood argues the district court abused its discretion in failing to explain why it imposed consecutive sentences.

At the December 7, 2012 sentencing hearing, the State recommended a sentence of 364 days, all suspended except for the time Underwood had already served, the minimum fine, and completion of the Batterer's Education Program (BEP). The State noted Underwood had been incarcerated since he committed

the assault on July 28, 2012. The defense concurred with the State's recommendation. Underwood told the court he planned to complete the BEP while serving out his existing sentence for "felony DUI."[4]

The sentencing court told Underwood it had considered "all the sentencing options provided by law" and "the arguments made here today by the attorneys" and committed him to the department of corrections for a period of one year with credit for time served. Underwood personally asked if the sentence was to run consecutively to his current term. The court stated the new term would "run consecutive to the sentence you're currently serving." The court then gave its reasons:

> In reaching the sentence, sir, I've taken into account a lot of factors, the assault in this case was very troubling at the very least. You were on probation at the time and you have a criminal record. Primarily I'm taking into account the serious nature of the assault. I don't know if that will make much difference on what you actually serve, but I believe that's appropriate in this case.

Under Iowa Rule of Criminal Procedure 2.23(3)(d), the sentencing court is required to state on the record its reason for selecting a particular sentence. "A trial court must also give reasons for its decision to impose consecutive sentences." *Jacobs*, 607 N.W.2d at 690. The sentencing court is not required to specifically connect its expressed reasons to the imposition of consecutive sentences, as long as the reasons may be found in "the overall sentencing plan." S*ee State v. Delaney*, 526 N.W.2d 170, 178 (Iowa 1994). "'A statement may be sufficient, even if terse and succinct, so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing

---

[4] Underwood had a third-offense operating-while-intoxicated conviction in May 2011.

discretion.'" *State v. Hennings*, 791 N.W.2d 828, 838 (Iowa 2010) (quoting *State v. Johnson,* 445 N.W.2d 337, 343 (Iowa 1989)).

We can tell from the sentencing court's conversation with Underwood that it was not under the misimpression consecutive sentences were mandatory. *See id.* at 838–39. The court offered its reasons for the sentence immediately following Underwood's inquiry whether the new sentence would run consecutively with his existing term for OWI. The timing of the court's articulation of its reasons supports upholding the sentencing. *See State v. Keopasaeuth*, 645 N.W.2d 637, 641 (Iowa 2002) (noting "consecutive sentences were imposed, and thereafter reasons for the sentence that had been pronounced were articulated").

The court cited Underwood's probationary status, his criminal record, and the serious nature of the crime. The court's reference to not knowing if its decision would "make much difference on what [Underwood] actually serve[d]" could only be interpreted as a direct reference to its decision to boxcar the sentences. We view the court's reasons as supporting its decision to run the sentences consecutively, as well as its basis for rejecting a suspended sentence. *See Jacobs*, 644 N.W.2d at 700 (finding no abuse of discretion where reasons adequately supported both the denial of probation and imposition of consecutive terms). We find no abuse of discretion.

**AFFIRMED.**