*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0011p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 07-4476

JEAN F. PANAK,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 07-00355-001—Solomon Oliver, Jr., District Judge.

Argued: December 12, 2008

Decided and Filed: January 9, 2009

Before: ROGERS, SUTTON and McKEAGUE, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Michael L. Collyer, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. William Lawrence Summers, SUMMERS & VARGAS, Cleveland, Ohio, for Appellee. **ON BRIEF:** Thomas J. Gruscinski, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. William Lawrence Summers, LAW OFFICES, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge. At issue in this appeal is whether the district court properly granted Jean Panak's motion to suppress incriminatory statements she gave to two Drug Enforcement Administration (DEA) investigators during an un-Mirandized interview, lasting 45 minutes to an hour, at her home. Because she was not in "custody" during the interview, we reverse.

1

I.

In the winter of 2006, DEA investigators became aware that Dr. Donald Chionchio, a dentist in Kinsman, Ohio, had purchased unusually large amounts of hydrocodone—a schedule-three controlled substance—in 2004 and 2005. Suspicious of the purchases, two investigators visited Chionchio's office on February 8, 2006, where Chionchio admitted that he was abusing hydrocodone and that he was illegally distributing the drug. The investigators seized Chionchio's license as well as his log books detailing the recipients, frequency and amounts of his hydrocodone distributions. Jean Panak, Chionchio's 76-year-old receptionist and sole employee, witnessed the inspection, heard "most or all" of the conversation between Chionchio and the investigators, JA 39, answered some questions from the investigators and saw the investigators seize the license and log books.

One week later, the same two investigators visited Panak's residence, where they questioned her about Chionchio's dental practice and his abuse and illegal distribution of hydrocodone. Panak told the investigators about her role in the office and what she knew about Chionchio's dental practice—including the high volume of hydrocodone prescriptions he filled without any apparent connection to dental work. At the conclusion of the 45-to-60-minute interview, the investigators thanked Panak, left her house and did not contact her again for some time.

Several months later, one of the investigators called Panak and asked her what the codes in Chionchio's log books meant. Panak answered his questions and confirmed that her handwriting appeared in the log books.

Over a year after the February 15 interview, Panak was indicted for (1) conspiring to distribute and to possess with intent to distribute hydrocodone, *see* 21 U.S.C. §§ 841(a)(1), 846; (2) possessing hydrocodone with intent to distribute it, *id*. § 841(a)(1); and (3) distributing hydrocodone, *id*. § 841(a)(1). Panak moved to suppress her statements from the February 15 interview, arguing that they were given without any warning of her Sixth and Fifth Amendment rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and were involuntary. The district court granted her motion on the *Miranda* claim and found it unnecessary to rule on her involuntary-statement claim.

II.

The United States filed this appeal, which we have jurisdiction to address on an interlocutory basis.  *See* 18 U.S.C. § 3731.  In doing so, "we review the district court's findings of fact for clear error and its conclusions of law de novo," *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007), and draw all factual inferences in favor of upholding the district court's suppression ruling, *see United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006).

III.

The Fifth Amendment says that an individual may not be "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To the ends of protecting that right, *Miranda* requires law-enforcement officers to give warnings, including the right to remain silent,  before interrogating individuals whom the officers have placed "in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted).  In drawing the line between a non-custodial encounter between a citizen and the police (where *Miranda* does not apply) and a custodial encounter (where it does), courts consider "all of the circumstances" surrounding the encounter, with "the ultimate inquiry" turning on whether "a formal arrest" occurred or whether there was a "restraint on freedom of movement of the degree associated with a formal arrest."  *Id.* (internal quotation marks omitted).  To answer this question, courts focus on the "objective circumstances of the interrogation," *id.* at 323, to determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action," *id.* at 325 (internal quotation marks omitted).  Several factors guide the inquiry:  the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions.  *See United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

Measured by these considerations, the February 15 encounter did not rise to the level of a custodial interrogation.  Start with the location of the encounter:  Panak's residence.  If a home is a "castle," 3 W. Blackstone, *Commentaries on the Laws of England* 288 (1768), a secure redoubt from the cares of the world, it presumably is the one place where

individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors. No doubt, some individuals may find it more difficult to do these things during a visit by the police. But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

Recognizing the differences between these settings, we have noted that, "when police question a suspect in a residence," the encounter "often" will "not rise to the kind of custodial situation that necessitates *Miranda* warnings." *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998); *accord Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008); *cf. United States v. Griffin*, 922 F.2d 1343, 1355 n.15 (8th Cir. 1990); 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(e) (3d ed. 2007). In *Miranda* itself, the Court quoted from a police manual that contrasted the differences between interrogations at a station house and the individual's home and emphasized the psychological advantages of station-house interrogations:

> If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages.

*Miranda*, 384 U.S. 449–50 (internal quotation marks omitted). In later explaining that the *Miranda* requirements do not apply to a non-custodial interview in a person's home, even though the individual has become the focus of an investigation, the Court reasoned that an important factor underlying *Miranda* was the interrogator's goal of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner.'" *Beckwith v. United States*, 425 U.S. 341, 346 & n.7 (1976) (quoting *Miranda*, 384 U.S. at 457). These concerns simply do not apply to most in-home interrogations, and both parties to this case as a result agree that an in-home encounter between the police and a citizen generally will be non-custodial.

But both parties also agree that all generalizations, including this one, have exceptions. Even when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual. *See, e.g.*, *Orozco v. Texas*, 394 U.S. 324, 325–26 (1969). The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining. *See United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008).

This interrogation, however, did not cross that line and retained a non-custodial hue throughout. The encounter began when the investigators knocked on Panak's door, Panak answered and the investigators told her that they wanted to ask her a few questions about Chionchio. Recognizing the two men from the prior week's inspection, Panak "let them in." JA 104. During the interview, Panak sat on her living-room couch, while the investigators sat in chairs. The interview lasted "[b]etween 45 minutes and an hour," JA 107, a length of time that compares favorably with other encounters we have deemed non-custodial. *See United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000) (less-than-an-hour interview); *United States v. Mahan*, 190 F.3d 416, 420, 422 (6th Cir. 1999) (hour-and-a-half interview).

During the interview, the officers did not handcuff Panak or physically restrain her, and they did not otherwise limit her freedom of movement. *See Swanson*, 341 F.3d at 530; *Crossley*, 224 F.3d at 862; *Salvo*, 133 F.3d at 951. She was never told that she could not leave, that she could not ask the investigators to leave or that she was required to answer their questions. Nobody raised his voice, the investigators did not possess, much less brandish, firearms or handcuffs, *see Crossley*, 224 F.3d at 862; *Mahan*, 190 F.3d at 422, and the investigators arrived at her home in an unmarked DEA Trail Blazer. Although they began the interview by telling her "[y]our boss is going to jail," JA 100, and questioned her about her knowledge of Chionchio's abuse and illegal distribution of hydrocodone, the investigators never threatened Panak with arrest, never told her that she was in trouble, never told her that she was a suspect and never told her that she was potentially subject to criminal penalties. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Mahan*, 190 F.3d at 422.

At the end of the interview, the officers did not arrest Panak or even suggest that they would; they simply thanked her and left.  *See Yarborough*, 541 U.S. at 664; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Consistent with the non-threatening and cooperative nature of this interview, one of the investigators called Panak several months later with some follow-up questions.  Panak answered the questions and does not complain about this follow-up interview.

One factor, it is true, cuts in the other direction.  During the February 15 in-home interview (and apparently during the office and telephone interviews), the officers never told Panak that she need not answer their questions or could end the interview at will.  But the existence of such advice is one factor among many, *Swanson*, 341 F.3d at 529, and we have never held that it is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting.  It would be strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings—that she need not answer the questions.  Proving the point, we have found law-enforcement interviews to be non-custodial when the officers never gave the individual this advice.  *See, e.g.*, *United States v. White*, 270 F.3d 356, 366 (6th Cir. 2001); *Crossley*, 224 F.3d at 861–62; *cf. Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996) (holding that officers need not "inform detainees that they are free to go before a consent to search may be deemed voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Still, the factor bears on the analysis, and it is a particularly important factor in showing that no custody occurred.  *See United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006); *see also Mathiason*, 429 U.S. at 495; *Swanson*, 341 F.3d at 530.  In 2004, the Eighth Circuit observed that it was unable to find a single precedent from the Supreme Court or the courts of appeals—save for a 1982 Ninth Circuit decision "decided under an outmoded standard of review"—that "holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning."  *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004).  But to say that such a clear warning likely would have guaranteed the non-custodial nature of this interview is not to say that its absence transformed the meeting into an arrest-like situation.  In a close case, sure enough, the existence of such advice might

affect the outcome. Had this interview occurred in a less congenial location, had the officers by word or action asserted their arrest authority or had they threatened Panak by emphasizing their knowledge of her guilt, the absence of such advice might have made all the difference.

But on these facts it did not. "All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave," *Yarborough*, 541 U.S. at 664–65, or, to be more precise in the setting of one's home, to ask the investigators to leave. The investigators' conduct did little to make the familiar surroundings of Panak's living room a freedom-robbing environment, and it thus did not rise to the level of a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322 (internal quotation marks omitted).

Considerable authority supports this conclusion. When presented with reasonably analogous facts, we likewise have concluded that in-home questioning did not rise to the level of custodial interrogation. *See, e.g.*, *White*, 270 F.3d at 366 (in-home interview not custodial where two federal agents questioned employee for 30 minutes about her submission of fraudulent monthly reports because employee had complete freedom of movement, was not handcuffed or physically restrained and agents made no suggestion that she was not free to leave); *United States v. Robinson*, 217 F. App'x 503, 507–509 (6th Cir. 2007) (same where three officers questioned defendant in living room about location of firearms even though defendant was not informed that the questioning was voluntary); *United States v. Flores*, 193 F. App'x 597, 605–606 (6th Cir. 2006) (same where six officers entered interviewee's home, interviewee was not handcuffed, confined or restrained and had a "casual conversation" with a detective while sitting on the living room sofa); *cf. Coomer*, 533 F.3d at 486 (same in an AEDPA-governed case). We have reached like conclusions in cases involving similar facts but where the interview occurred at a suspect's place of employment. *See Crossley*, 224 F.3d at 861–62; *Mahan*, 190 F.3d at 421–22; *see also Mason v. Mitchell*, 320 F.3d 604, 631–32 (6th Cir. 2003). And our sister circuits have reached similar conclusions under comparable circumstances. *See, e.g.*, *United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992).

Just as importantly, today's fact pattern differs materially from the cases in which courts have come out the other way. *See, e.g.*, *Orozco*, 394 U.S. at 325–27 (in-home interrogation custodial where four officers entered defendant's bedroom at 4 a.m. and where one officer testified that "[f]rom the moment he gave his name" the defendant was "not free to go where he pleased but was under arrest"); *Craighead*, 539 F.3d at 1084–89 (same where eight law-enforcement officers from three different agencies entered defendant's house—all of whom were armed and some of whom wore protective gear and unholstered their firearms in defendant's presence—and questioned defendant in a back storage room with the door closed while other officers executed a search warrant in the house); *United States v. Newton*, 369 F.3d 659, 675–77 (2d Cir. 2004) (same where six officers came to defendant's apartment and questioned him while he was handcuffed and in his underwear); *United States v. Madoch*, 149 F.3d 596, 600–01 (7th Cir. 1998) (same where federal agents entered defendant's home at 7:00 a.m., ordered defendant into kitchen, ran through the house yelling, handcuffed her husband and took him away, told defendant she could not leave the kitchen, did not let her answer the telephone and held her for five hours).

In looking at this issue, the district court reached a different conclusion, which is reason enough for thinking twice about whether Panak was being held in custody. *First*, the court noted that Panak was present at the February 8 office inspection, which gave her "specific knowledge of the extent of the information that the investigators had acquired concerning Chionchio's and, by extension, [Panak's], alleged illegal activities," *United States v. Panak*, No. 4:07 CR 355, 2007 WL 3355088, at *3 (N.D. Ohio Nov. 7, 2007). But Panak's knowledge of this information does not change the equation. The question is not whether the interviewee knew of evidence that she may have committed a crime—after all, we undertake the custody analysis from the perspective of a reasonable person "*innocent of any crime.*" *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003) (internal quotation marks omitted); *accord United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985). And the question is not whether the investigator knew of evidence inculpating the interviewee. *See Stansbury*, 511 U.S. at 324–25. The question, rather, is whether the investigator connected the two in front of the individual. An investigator's knowledge of an individual's guilt "may bear upon the custody issue" not simply because the officer possesses incriminating evidence but because he has

"conveyed [it], by word or deed, to the individual being questioned," *id.* at 325, and thus has used the information to create a hostile, coercive, freedom-inhibiting atmosphere. That is why such knowledge is relevant only if (1) it was "somehow manifested to the individual under interrogation" and (2) it "would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Salvo*, 133 F.3d at 952.

Yet none of that happened. The investigators, at most, made it clear that Chionchio was in jeopardy, not that Panak was, all of which was consistent with her observations of the dental-office inspection the week before and her answers to the investigators' questions at that time. During the in-home interview, the officers did not attempt to use any incriminating information *against Panak* to leverage their authority over her: They never told Panak she was in trouble, never told her she was a possible suspect, never asked her any accusatory questions, never told her she was potentially subject to criminal penalties and never reminded her of any information they may have gathered against her during the office visit. The same is true of the investigator's telephone call to Panak a few months after the in-home interview, in which she answered some additional questions about the meaning of certain codes in the dental records.

That forces Panak to argue that a reasonable person, who knew that the investigators were aware of Chionchio's illegal activities but who was never threatened with or told of any potential criminal liability that *she* faced, would have felt that her freedom of action had been curtailed to the degree associated with a formal arrest. Not here, we think. Indeed, it bears remembering that, even if the investigators had told Panak that they suspected her of a crime and that they had evidence against her, such a statement, without more, would not necessarily have made the encounter custodial. *See Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). Perhaps in some circumstances a reasonable innocent person, who knew that her coworkers were under criminal investigation, might feel that her freedom of action had been curtailed to the degree associated with a formal arrest. But these facts do not warrant such a holding.

*Second*, the district court noted that "the investigators ignored [Panak's] statement that she did not want to speak with them.  The investigators told [Panak] that her long-time employer was going to jail, and they implied that negative results would occur if she persisted in her refusal to be questioned."  *Panak*, 2007 WL 3355088, at *4.  While this consideration provides some support for the district court's conclusion, it does not show that Panak was in custody.

Here is what Panak said in full at the suppression hearing on this topic:

Q:      Did you indicate to them that you really did not want to answer any questions?

A:      Yes, I did.

Q:      Tell us exactly what you remember saying.

A:      He said, "Did your boss ever dispense Vicodin without an antibiotic," and I said, "I do not want to answer that question, because you have the books and you know what he did."  And he said it will be to the best of your knowledge—to the best of your benefit, he said, if you answer the questions we're going to ask you.

JA 100–01.

Giving the district court's finding and Panak's testimony the benefit of the doubt, we think that they indicate that at some point during the interview Panak did not want to answer any more questions (because the agents knew what Chionchio "did") and that the "to the best of your benefit" comment encouraged her to continue the interview—which she did and which she did without manifesting any other expressions of concern about continuing the interview.  Even then, however, the investigators' response would not make a reasonable person feel her freedom to move, to leave or to ask the officers to leave had been encumbered in a manner akin to the custody associated with an arrest.  Panak acknowledges that the investigators never threatened her or told her that she was in trouble and does not deny that the investigators never told her that she was a suspect or potentially subject to criminal penalties.  Without more, this sort of prompting, at least in the absence of contextual clues indicative of a veiled threat, does not make the encounter custodial.

In defending the district court's decision, Panak separately argues that she did not "remember inviting [the investigators] in" and that she "just opened the door and they just

came in." JA 100. But while she may not have "invit[ed]" the investigators into her home or given them explicit permission to enter, Panak acknowledged that she knew who the investigators were (given the office inspection the week before) when they appeared at her doorstep. And when they told her that they wanted to ask her a few questions about Dr. Chionchio, she allowed them into her house. "I let them in my house," she said. JA 104. Whatever the difference between "inviting" and "letting" someone into a home, the investigators plainly did not force their way in against her wishes but entered only after she allowed them to do so, a feature of the encounter that is perfectly consistent with a non-custodial interview.

Panak has not offered any argument, and the district court made no finding, that turns on the relevance of the general life experiences or mental faculties of a reasonable 76-year-old. That may be because there is some debate about the relevance of an individual's age in this setting. *Compare Yarborough*, 541 U.S. at 666–68 (plurality opinion) (suggesting that a suspect's age is irrelevant to the custody analysis), *with id.* at 669 (O'Connor, J., concurring) (stating that "[t]here may be cases in which a suspect's age will be relevant to the 'custody' inquiry under *Miranda*"). Be that as it may, Panak has not made any argument bearing on how a reasonable 76-year-old person would have perceived her freedom to leave in this setting, We thus need not address the point. The point, however, does prompt a different question: Why did the government indict a 76-year-old, part-time dental secretary who, whatever she did or did not do in working for Dr. Chionchio, cannot plausibly be characterized as the key culprit in this alleged crime? There will be time enough to answer that question on remand.

In the final analysis, Panak fails to come to terms with the fact that, while any encounter with law enforcement officials may have "coercive aspects to it, simply by virtue of the fact that the [official] is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," investigators "are not required to administer *Miranda* warnings to everyone whom they question," and a "noncustodial setting is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive atmosphere." *Mathiason*, 429 U.S. at 495. While Panak may well have felt some internal pressures to answer the investigators' questions (to

relieve her conscience or to curry favor with the investigators) and some external pressures (due to the status and manner of the questioners), we cannot say that she was subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322 (internal quotation marks omitted). The question in the end is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them. No such showing was made here.

IV.

Because it found that Panak was "in custody" at the time of questioning, the district court "decline[d] to address" Panak's alternative argument that her statements were not made voluntarily. *Panak*, 2007 WL 3355088, at *5. Rather than determine for ourselves whether Panak's statements were involuntary, we remand this issue to the district court so that it may consider this distinct question in the first instance.

V.

For these reasons, we reverse and remand for further proceedings.