NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0623n.06

No. 12-5973

**FILED**
**Jul 02, 2013**
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| MICHAEL STEVE CONDER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| _____ | ) | |

Before: GILMAN, GRIFFIN, and WHITE, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** In May 2012, Michael Steve Conder entered a conditional guilty plea to one count of possessing child pornography, reserving the right to appeal the district court's earlier denial of his motion to suppress evidence. Conder argues, as he did unsuccessfully in the district court, that the government obtained incriminating statements from him during a custodial interrogation without first providing the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). He further contends that incriminating statements he made after receiving the *Miranda* warnings are inadmissible because they were tainted by the prior alleged *Miranda* violation. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I. BACKGROUND

#### A. Factual background

Donald Obermiller, a Senior Special Agent with the Department of Homeland Security's Immigration and Customs Enforcement (ICE), was assigned to a federal task force in Memphis

focusing on crimes against children. He obtained a search warrant in July 2010 to look for evidence that a particular cellular telephone had been used to transmit and/or receive images of child pornography. The number assigned to that telephone was linked to Conder, and the warrant authorized a search for the telephone in both Conder's residence in Medina, Tennessee and on Conder's person.

Obermiller, accompanied by three other federal agents and one local police investigator, went to Conder's mobile home on August 10, 2010 to execute the search warrant. Tommy Craig Pannell, a fellow ICE agent, and Obermiller were the first of the five law-enforcement officers to approach the mobile home. They parked at the end of the driveway and walked up to the back door because it appeared to be the one normally used. When no one answered their knock, they returned to their vehicle to leave.

But before they left, Conder pulled into the driveway, parked behind and to the side of the agents' vehicle, and stepped out of his truck. Obermiller and Pannell approached Conder, identified themselves as federal agents, and requested to speak with him. Conder agreed, and the three men walked toward the back of the mobile home where there was a porch. At that point, two Federal Bureau of Investigation agents—Stephen Lies and Keith Melancon—parked their vehicle in the driveway behind Conder's truck. Obermiller asked Conder if they could speak inside the home, and Conder replied that they could. Once Conder opened the back door and walked inside, Obermiller paused before entering the home and asked if Conder was inviting the other agents to come inside as well. Conder confirmed that he was. Obermiller, Pannell, and Melancon then entered the home. (Lies was speaking with Conder's mother, who had just pulled into the driveway in a separate vehicle, and the police investigator remained outside.)

The four men gathered in Conder's kitchen, which was open to the living area of the mobile home. No agent stood between Conder and the home's front or back doors. Each of the agents was armed, but only Melancon's weapon was visible. At no point did any agent draw his weapon.

Obermiller first asked whether Conder had any computers or internet access in his home. Conder said that he did not, and he offered to let the agents search the premises to verify his answer. The agents then asked whether Conder had viewed or had access to any kind of pornography. Conder answered that he did not. They next specifically asked Conder whether he had viewed any images that might be considered child pornography, to which Conder again responded in the negative.

Obermiller then focused on questions about Conder's cellular telephone. He first asked for the number of that telephone and, when it was given, recognized the number that Conder recited as the number identified in the search warrant. Obermiller next asked Conder if he knew how that number came to be in the memory of a telephone in Connecticut that had sent and received images of child pornography. Conder said that other people had, without his asking, sent him child-pornography images and that he had been deleting those images, but had not finished deleting all of them. When asked, Conder said that his cellular telephone was in the truck parked in the driveway. Obermiller then requested Conder to consent to a search of his truck and his cellular telephone. Conder refused, but again offered to let the agents search his home. Upon Conder's refusal to consent, Obermiller served Conder with the search warrant.

Pannell left the home to retrieve Conder's telephone from the truck in the driveway. Meanwhile, Lies entered the home with Terry Buckley (the local police investigator) and joined

Obermiller and Conder, who were then sitting at the kitchen table.  Pannell returned and joined Buckley and Melancon in searching the home.

Obermiller advised Conder that he was not under arrest, was not going to be placed under arrest,  and that the agents were there only to collect information.  He also read Conder his *Miranda* rights, and Conder initialed and signed a form that advised him of those same rights.  Conder then proceeded to tell the agents that he had been using his cellular telephone to request, receive, and send images of child pornography and that he preferred depictions involving children around the ages of 11 to 13 years old.  Those same admissions were included in a statement that Conder provided to Obermiller and subsequently signed.

The length of time from when the agents arrived at Conder's residence until they left is unclear, but even the longest estimate was no more than an hour and forty-five minutes.  Both Conder and the interviewing agents used a conversational tone of voice at all times, and no agent ever touched Conder.  Conder was never physically restrained and was not threatened or promised anything in exchange for his written statement.

## B.    Procedural background

In December 2010, a federal grand jury returned an indictment charging Conder with knowingly possessing images of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). Conder filed a motion to suppress his statements to the law-enforcement agents and the contents of the cellular telephone found in his truck.  The district court denied the motion after a hearing, concluding that Conder was not in custody when he made the statements in question.  Conder then entered a conditional guilty plea, was sentenced to 120 months of imprisonment, and appealed the district court's denial of his motion to suppress evidence.

## II. ANALYSIS

### A.    Standard of review

This court reviews factual findings under the clear-error standard and legal conclusions de novo. *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012). "When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). "The question of whether a defendant was 'in custody' is a mixed question of fact and law, and is thus reviewed de novo." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).

### B.    Pre-*Miranda* statements

Conder argues that the district court should have suppressed the self-incriminating statements that he made prior to receiving the *Miranda* warnings because they were the product of a custodial interrogation. But the district court disagreed, concluding that Conder was not in custody during the course of questioning in his home. Conder does not contend that any of the court's factual findings were clearly erroneous. Rather, he disputes the court's legal conclusion that he was not in custody.

"The Fifth Amendment protects a criminal defendant from compelled self-incrimination, and the Supreme Court has required that a criminal defendant be apprised of certain rights prior to a custodial interrogation." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citation omitted). "The *Miranda* requirements apply only when there has been such a restriction on a person's freedom as to render him in custody." *Id.* (internal quotation marks omitted).

To differentiate between custodial and noncustodial encounters, courts consider the totality of the circumstances of the encounter, "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a

formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks omitted). "[C]ourts focus on the objective circumstances of the interrogation to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* (citation and internal quotation marks omitted). Other factors guiding the inquiry include

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

Conder points to several factors in support of his contention that he was in custody when he told Agent Obermiller that there were images of child pornography on his cellular telephone: (1) he was confronted by multiple law-enforcement agents, (2) one agent had a visible weapon, (3) Conder's truck was blocked by a law-enforcement vehicle, (4) one of the unmarked law-enforcement vehicles contained a visible "cage" that is used when a person is arrested, (5) the agents did not tell Conder that he was free to refuse answering any questions and to terminate the interview, and (6) Obermiller's possession of the search warrant and his questioning clearly indicated that Conder was suspected of having committed a crime.

Two of these factors—the position of one law-enforcement vehicle behind Conder's truck and the presence of a "cage" in another—are irrelevant because the custody inquiry considers the circumstances from the position of the person being questioned. *See Panak*, 552 F.3d at 465. The

record does not indicate that Conder was aware of either of the above details about the vehicles in his driveway when he was being questioned. Although there is a possibility that Conder saw Agents Lies and Melancon park their vehicle behind Conder's truck and that he saw that one of the law-enforcement vehicle had a "cage," there is no proof that he did, nor does he so argue. Because we must "draw all factual inferences in favor of upholding the district court's suppression ruling," *see id.*, we will disregard these two factors in our custody analysis. In the same vein, the fact that Obermiller possessed a search warrant does not bear on our analysis because Conder made self-incriminating statements before he knew about the warrant. *See United States v. Reynolds*, 762 F.2d 489, 493 (6th Cir. 1985) (holding that the existence of arrest warrants was irrelevant to the custody analysis because the warrants were unknown to the defendants).

The remaining factors are relevant but do not amount to a showing of custody in light of stronger countervailing factors and Sixth Circuit precedent. This court has explained that police encounters in a person's home typically do "not rise to the kind of custodial situation that necessitates *Miranda* warnings" because the home "presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave." *Panak*, 552 F.3d at 465–66; *see also United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (explaining that the fact that questioning by the police occurred in the defendant's home was "significant" to the custody inquiry because "such a venue generally does not present a coercive environment").

An important concern in the *Miranda* decision was the potentially coercive police tactic of isolating suspects in unfamiliar environments solely to "subjugate the individual to the will of his

examiner." *Panak*, 552 F.3d at 466. But that concern does not apply to most in-home interrogations, even when "the individual has become the focus of an investigation." *Id.* Conder rightly notes, however, that not every case will fit this generalization. *See id.* "Even when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual." *Id.*

But the present case falls in line with prior cases of in-home interrogations that this court has deemed noncustodial. Conder, like the defendants in *Panak* and *Hinojosa*, fails to identify circumstances that transformed his home "into an interrogation cell." *See id.*; *Hinojosa*, 606 F.3d at 884. Indeed, comparing the circumstances in the present case with those in *Hinojosa* weighs heavily against Conder's argument.

Similar to the present case, the law-enforcement agents conducting the in-home interrogation in *Hinojosa* did not restrain the defendant's freedom of movement, did not draw their weapons, did not make threats or otherwise act in a hostile or coercive manner, and did not reveal that they had a warrant to arrest the defendant. *Id.* at 883. Hinojosa's encounter with the agents prior to receiving the *Miranda* warnings was relatively brief, as it was for Conder. *See id.* ("The interview was of short duration—lasting only a few brief questions . . . ."); *see also Panak*, 552 F.3d at 467 (noting that an interrogation lasting between 45 minutes and one hour "compare[d] favorably with other encounters [that this court has] deemed non-custodial" and citing cases in support).

Although Conder's entire encounter with law-enforcement agents might have lasted up to an hour and forty-five minutes, Obermiller asked only five questions before Conder made self-incriminating statements. And whereas Hinojosa's wife answered the door and invited the agents into the home, *see Hinojosa*, 606 F.3d at 879, it was Conder himself who granted the agents

permission to enter, further demonstrating a degree of control over the encounter that is inconsistent with being in custody, *see United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998) (noting that courts have relied on a suspect's voluntary admission of officers into his residence as a sign that subsequent police questioning was noncustodial).

Another key similarity is that Hinojosa "refused to consent to the further search of his residence," much like Conder refused to consent to the search of his vehicle or his cellular telephone, "which suggests that the environment was not coercive." *See Hinojosa*, 606 F.3d at 883. The willingness to refuse the request of a law-enforcement officer is another factor indicating that a defendant was not in custody because it shows a degree of freedom of action. *See, e.g.*, *Salvo*, 133 F.3d at 952 ("While the agents' statements made it clear that Salvo was the target of a criminal investigation, Salvo's freedom of action, during and after the interview, mitigated against the possibility that he would feel 'in custody.'"). In sum, Conder has provided no convincing reason for why his interrogation should be deemed custodial when Hinojosa's interrogation was determined to be noncustodial.

Conder, moreover, overstates the importance of the fact that the agents did not tell him that he could refuse to answer questions and could terminate the interrogation at will. Although these factors cut in his favor, this court has never held that such admonitions are a necessary condition of a noncustodial interrogation. *See Panak*, 552 F.3d at 467. "It would be strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings—that [he] need not answer the questions." *Id.*; *see also United States v. Crossley*, 224 F.3d 847, 861–62 (6th Cir. 2000) (holding that an interrogation was noncustodial even though law-enforcement agents did not advise the defendant that she was free to leave). These

factors could affect the outcome of the custody analysis in a closer case, such as when an interrogation occurs in a police station or when the law-enforcement agents threaten the detainee. *See Panak*, 552 F.3d at 468. But they do not outweigh the substantial factors cutting the other way in the present case that support the district court's conclusion that Conder's interrogation was not custodial.

Conder similarly places too much weight on the presence of a visible weapon during his interrogation, given that this court focuses on whether weapons were drawn rather than merely visible, *see, e.g.*, *Hinojosa*, 606 F.3d at 883, and that even a drawn weapon does not necessarily establish custody, *see United States v. Swanson*, 341 F.3d 524, 526, 530–31 (6th Cir. 2003) (concluding that the defendant was not in custody during questioning even though officers had approached the defendant with drawn weapons and detained him while checking an electronic network for any outstanding warrants). In sum, the district court did not err when it determined that Conder was not in custody prior to receiving the *Miranda* warnings.

## C.    Post-*Miranda* statements

Conder's entire argument for why his self-incriminating statements made after receiving the *Miranda* warnings should be suppressed depends on the preliminary issue of whether his pre-*Miranda* statements were the product of a custodial interrogation. Because we conclude that Conder was never in custody, his argument for suppressing his post-*Miranda* statements necessarily fails.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.