NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0260n.06

Case No. 21-6176

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 29, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| SHAUN DOUGLAS DICKSON, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

SUTTON, Chief Judge. Shaun Dickson claims that law enforcement agents violated the Fifth Amendment when they questioned him at his home about possession of child pornography without giving him *Miranda* warnings and violated the Fourth Amendment when they seized his cell phone without a warrant. Because Dickson did not face a custodial interrogation and because exigent circumstances justified seizing his phone, we affirm the district court's denial of his motions to suppress evidence.

I.

The Department of Homeland Security sent information about a Louisville resident's involvement in a child pornography investigation to Detective Michael Littrell, a member of the Kentucky Attorney General's cyber crimes unit. Detective Littrell obtained a warrant to search the house where the suspect, Shaun Dickson, lived. By the time the officers executed the warrant

on November 1, 2017, Dickson had moved out. An agent found evidence that potentially pointed to Dickson's new address. The officers went to the new location to see if Dickson lived there and to see if he would answer their questions.

At roughly 11:30 a.m., six agents arrived at the new address. Two of them, Detective Littrell and Agent Brad Hutchinson, went to the door and knocked. Dickson answered. The officers wore plain clothes and did not display any weapons. They showed Dickson their credentials, offered a "high-level overview of the[ir] investigation," and asked if they could come in and ask him some questions. R.42 at 6. Dickson invited them inside. Because Dickson's brother was there, the officers asked Dickson if they could speak in a more private area given the sensitive nature of the investigation. At Dickson's suggestion, they moved to the living area in the basement, an approximately 1,200 square-foot open space.

Detective Littrell, Agent Hutchison, and Agent Heather D'Hondt accompanied Dickson downstairs. The interview lasted about an hour. Detective Littrell, Agent Hutchison, and Dickson initially sat on Dickson's furniture. Agent D'Hondt, who was "very new" to the cyber crimes unit, stood against the wall by the stairs to observe the interview. *Id.* at 8. During the conversation, Dickson smoked cigarettes, moved freely about the room, and went to the bathroom. He was not handcuffed or otherwise restrained. The officers did not advise Dickson of his *Miranda* rights.

Dickson at first denied any involvement with the activities under investigation. He told the agents that he accessed the internet using a cell phone but that he did not have it with him. After 20 or 30 minutes, Dickson got up to use the restroom. At that point, Agent D'Hondt noticed the outline of a cell phone in Dickson's pocket. She asked him about it. Dickson pulled the phone out of his pocket and began "manipulating the screen." *Id.* at 11. Concerned that Dickson was deleting evidence, Detective Littrell grabbed the phone. The screen displayed an image of a naked

2

baby. Detective Littrell kept the phone and put it in "airplane mode" to prevent the deletion of any content. *Id.* at 12.

Dickson became upset. After he calmed down, Detective Littrell asked if Dickson was willing to look through the phone with the officers. Dickson agreed. The phone contained images of "naked babies, and toddlers, and teenagers." *Id.* at 14. Dickson explained that he downloaded the images so that he could report the people who created them.

After a few more minutes of conversation, Detective Littrell consulted with Agent Hutchison and decided to arrest Dickson for possessing child pornography. Additional police officers arrived at the residence a few minutes later, handcuffed Dickson, and transported him to a detention center.

A grand jury indicted Dickson for producing, possessing, distributing, and attempting to produce child pornography. He moved unsuccessfully to suppress the statements he made to police at his home and the evidence gathered from his cell phone. Dickson entered a conditional guilty plea, reserving his right to appeal the denial of his motions to suppress. The district court sentenced him to 384 months.

## II.

In assessing a district court's ruling on a suppression motion, we give a fresh look to the court's legal conclusions and clear-error review to its factual findings. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). We view the evidence in the light most favorable to the district court's decision, here its decision to deny the motions. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006).

*Fifth Amendment*. A person may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect that right against self-incrimination, police

3

officers must give certain warnings, including the right to remain silent, before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In deciding whether a person is "in custody" for *Miranda* purposes, we consider all of the "objective circumstances . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). The "ultimate inquiry is whether . . . the interviewee's freedom of movement was restrained to a degree associated with formal arrest." *Id.* Familiar factors guide the assessment: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *Panak*, 552 F.3d at 465.

Gauged by these considerations and the circumstances facing Dickson, he was not in custody during the interview. The officers questioned him in his home, "a fact that typically weighs against being 'in custody.'" *Luck*, 852 F.3d at 621 (quotation omitted). The manner and length of questioning do not raise any red flags either. The conversation was "pretty laid back." R.42 at 9. And an hour-long interview is "not lengthy" by conventional standards. *Luck*, 852 F.3d at 621; *see Panak*, 552 F.3d at 467. He also was free to move and do what he wished. During the interview, Dickson moved around the basement, smoked cigarettes, and used the bathroom. The officers "did not handcuff" Dickson or "physically restrain" him, and "they did not otherwise limit [his] freedom of movement." *Panak*, 552 F.3d at 467. All signs considered, a reasonable person in Dickson's position would not think the officers had restrained his freedom of movement to a degree associated with a formal arrest.

We appreciate the contrary arguments, but they do not change things. The officers, sure enough, did not tell Dickson that he did not need to answer their questions—one of the *Miranda* warnings. But that does not make the encounter custodial. Recall that the officers knocked on the door, introduced themselves, "asked [Dickson] if he would answer a few questions regarding an investigation," and entered at his invitation. R.42 at 35. They never restrained Dickson or told him that he could not move about the room or leave. Advising an individual that he need not answer an officer's questions is "one factor among many," and "we have never held that it is a necessary condition . . . before officers may question an individual in a non-custodial setting." *Panak*, 552 F.3d at 467. Else, the decision not to give this *Miranda* warning would always mean it should have been given, a conclusion at odds with the whole point of the custody inquiry.

Dickson claims that he refused to let the officers enter his home when they knocked on the door and that they barged in anyways. But the district court did not find Dickson's testimony credible, noting his admissions that he "was doing a little bit of drugs" at the time and that the drugs affected his memory. R.49 at 3. We cannot embrace Dickson's version of events when the district court accepted the officers' contrary telling and had ample credibility-based reasons for doing so. *United States v. Garrido*, 467 F.3d 971, 977–79 (6th Cir. 2006).

Dickson adds a few other weights to the custody side of the scale, noting his proximity to the three officers, his lack of experience with the police, and the officers' intent to elicit incriminating statements from him. But these arguments do not alter our conclusion either. The presence of three officers does not "transform one's castle into an interrogation cell." *Panak*, 552 F.3d at 466. In other cases featuring in-home encounters with officers, such "questioning" likewise "did not rise to the level of custodial interrogation." *Id.* at 468. That's especially so here because the agents did not restrain Dickson's freedom of movement in any way within the house or even

5

limit him from leaving the house. Nor does Dickson's lack of experience with law enforcement or the officers' subjective intentions alter the "objective" in custody determination. *See Yarborough v. Alvarado*, 541 U.S. 652, 667–68 (2004) ("We do not ask police officers to consider these contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights."); *California v. Beheler*, 463 U.S. 1121, 1124 & n.2 (1983) (per curiam) (rejecting the notion that the "in custody" requirement is satisfied "merely because the police interviewed a person who was the 'focus' of a criminal investigation").

What of Dickson's suggestion that the questioning became custodial after the officers took his phone and told him "[w]e need to talk about this and figure out what's going on"? R.42 at 13. The pertinent question, though, "is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them." *Panak*, 552 F.3d at 471. That the officers asked Dickson if he would talk about the phone, incriminating though it might have been, did not suddenly make a non-custodial interview custodial. The issue is not whether he subjectively thought he was about to be caught for committing a crime; it is whether he objectively was free to leave. Nothing prohibited him from ending the conversation then and there. Even prime suspects in investigations may be "free to come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325 (1994). And even after taking Dickson's phone, the officers did not restrict his activity. So far as his admissions go, this was a non-custodial encounter from beginning until his formal arrest at the end.

*Fourth Amendment*. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Under that guarantee, officers may seize personal property without a warrant when they have probable cause to think "the exigencies demand it." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997). One recognized exigent circumstance "is an

urgent need to prevent evidence from being lost or destroyed." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988). To invoke the exception, the government must "show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent," *id.* at 1512, after which we weigh "the governmental interest being served by the intrusion against the individual interest that would be protected if a warrant were required," *United States v. Plavcak*, 411 F.3d 655, 664 (6th Cir. 2005).

The officers had a reasonable basis for fearing the imminent loss of evidence. Before arriving at the home, the officers suspected Dickson of possessing child pornography. And officers apprised Dickson of the nature of their investigation and asked if he would answer some questions. Dickson told them that he accessed the internet using a cell phone but that he did not have it with him. When Dickson got up to use the restroom, the officers noticed the outline of a phone in his pocket. When asked about it, Dickson pulled out the phone and began "manipulating the screen." R.42 at 11. A reasonable officer, having caught Dickson in the lie about the whereabouts of his cell phone, could conclude that he was trying to destroy evidence. As soon as Detective Littrell looked at the phone, he saw an image of a naked baby. Taken together, these facts justified the immediate seizure of the phone.

The government's "important interest in preventing the spread of child pornography," *United States v. Moore*, 916 F.2d 1131, 1139 (6th Cir. 1990), outweighs the brief intrusion on Dickson's privacy. Detective Littrell, moreover, did not search Dickson's phone right after grabbing it. He merely put it in airplane mode to prevent the destruction of evidence. The agents did not look through Dickson's phone until after he consented to their doing so. Exigent circumstances justified this brief seizure of Dickson's cell phone.

Pushing back, Dickson suggests that no exigent circumstances existed because the "image of a naked baby on the phone's screen" was "not necessarily pornographic." Appellant's Br. 29. That is a contestable point in these circumstances. But even if the officers had not seen that image, they still had good reason to take Dickson's phone. Given what they knew at this point in their investigation, given that Dickson misled them about the phone's whereabouts, and given that he began manipulating the phone's screen when they noticed it, the officers had a reasonable basis for thinking that Dickson was attempting to destroy evidence. No Fourth Amendment violation occurred.

We affirm.