NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0222n.06

No. 25-3552

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 20, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) | |
| MICHAEL JAMES, | ) | |
| Defendant-Appellant. | ) | OPINION |

Before: BOGGS, BATCHELDER, and MOORE, Circuit Judges.

**BOGGS, Circuit Judge.** This appeal challenges the denial of a motion to suppress incriminating statements obtained during a police interview with then 28-year-old Michael James and evidence recovered from a search of his phone—namely, hundreds of files depicting the sexual abuse of children. James contends that his *Miranda* rights were violated and that the search exceeded the scope of his consent, in violation of the Fourth Amendment. The district court rejected those arguments, and rightly so. Because the record supports the court's conclusions and reveals no constitutional violations, we affirm.

I

In June 2024, an undercover FBI agent posing as a minor posted on an anonymous social media application called "Whisper" that she was pregnant and feared her parents' reaction. Michael James, using the username "Ambient_Sun," initiated contact by sending her private messages. After asking her age and learning that she was eleven, James did not end the exchange.

Instead, he described sexual acts that he intended to perform on the child, sent a photograph of his genitalia, and stated that he would travel to meet her the next day, asking for her address and proposing to take her to a hotel for sex. The messages also contemplated repeated sexual activity, repeated impregnation, and James's continued control over the child's life, including statements that any daughters she might have would be subjected to similar treatment at a young age.

This exchange led to two law-enforcement officers—FBI Special Agent Austin Johnston and FBI task-force officer Katherine Jarvis—paying James a visit at his Ohio residence the following month. Upon arrival, the officers were calm and cordial, reassuring James that they "just want[ed] to have a conversation" about his online activities and did not intend to arrest him that day. During the subsequent in-home interview, which lasted less than thirty minutes, James signed a consent form that advised him of his "right to refuse consent" and authorized a "complete search" of his phone and a seizure of "any items . . . related to [the] investigation." Johnston and Jarvis then performed a preliminary in-home search of the phone and discovered child pornography.

The officers ended the interview without arresting James and seized his phone to perform an off-site forensic examination, which revealed 764 files containing suspected child pornography, including videos depicting the molestation of prepubescent and infant minors. Law enforcement also discovered that James had been receiving and distributing child pornography through apps such as Whisper and Telegram for at least two and a half years.

On September 19, 2024, James was indicted on one felony count of Receipt and Distribution of Visual Depictions of a Minor Engaged in Sexually Explicit Conduct and one felony count of Possession of Child Pornography. He moved to suppress the evidence against him on two grounds relevant to this appeal. He first argued that his interview statements, which included

an admission to downloading child pornography, should be suppressed because police subjected him to a custodial interrogation in his home without issuing *Miranda* warnings. He also sought suppression of the evidence obtained from the full search of his phone, arguing that his consent extended only to a search of the Whisper application.[1] In an oral ruling, the district court recited its factual findings, rejected all of James's arguments, and denied his motion to suppress.

James pleaded guilty and was sentenced to 151 months of imprisonment. His plea agreement preserved his right to appeal the suppression ruling. He now does so.

## II

"When a defendant appeals the denial of a motion to suppress evidence, we review the district court's findings of fact under the clear-error standard[,] and we review its conclusions of law de novo." *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019). Whether the defendant was "in custody" for *Miranda* purposes is a mixed question of law and fact reviewed de novo, while the district court's underlying factual findings are reviewed for clear error. *Thompson v. Keohane*, 516 U.S. 99, 112–15 (1995); *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015) (citation omitted). The district court's determination that the search did not exceed the scope of the defendant's consent is a question of fact reviewed for clear error. *United States v. Garrido-Santana*, 360 F.3d 565, 570 (6th Cir. 2004). "In addition, when the district court denies a motion to suppress, we review all evidence in the light most favorable to the government." *United States v. Harris*, 2025 WL 3689136, at *2 (6th Cir. Dec. 19, 2025) (citation modified).

"To be clearly erroneous, . . . a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish."

---

[1] The district court also considered and rejected a voluntariness claim under the Due Process Clause of the Fourteenth Amendment but observed that it "was not really developed," and James has not meaningfully developed any such claim on appeal.

*United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (Nelson, J.) (citation modified). The presence of a recording in this case does not alter that standard. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (explaining that clear-error review applies even to a district court's assessments of physical evidence). A recording may, however, show that a factual finding is clearly erroneous if the audio plainly contradicts the account credited below.[2]

**A. *Miranda***

James argues on appeal that the statements he made during the officers' home visit should be suppressed because he was subjected to custodial interrogation without *Miranda* warnings. A suspect is in *Miranda* custody when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave" and "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citation modified). The inquiry is objective; we ask "how a reasonable man in the suspect's position would have understood his situation" in light of the totality of the circumstances. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In applying that standard, we consider factors such as the location of the interview, its length and manner, any

---

[2] James cites *Feagin v. Mansfield Police Department*, 155 F.4th 595, 600 (6th Cir. 2025), for the proposition that a video or audio recording allows appellate courts to assess factual questions for themselves and draw their own inferences. This interpretation of *Feagin* proves too much. Recordings do not turn appellate courts into factfinders—they merely prevent courts from crediting impossible facts. *Feagin* itself was an application of the principle that courts may reject a plaintiff's factual account only when the recording "blatantly contradict[s]" it—that is, when the recording "so utterly discredit[s]" the account that it becomes a "visible fiction." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also Feagin*, 155 F.4th at 601 (citing *Scott*, 550 U.S. at 380). Similarly, under clear-error review in the criminal-suppression setting, we will not depart from the district court's findings even if a recording more strongly supports a different account. In either instance, appellate courts defer to plausible accounts of the facts and reject only those that the record clearly cannot sustain.

restraint on the suspect's movement, and whether the suspect was warned that he does not need to answer questions. *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). While the issuance of such a warning "is a particularly important factor in showing that no custody occurred," the *absence* of a warning (as here) may "transform[] a meeting" with police "into an arrest-like situation" in "a close case." *Id.* at 467–68.

Assessing the totality of the circumstances, we conclude that James's encounter with police did not amount to a custodial interrogation. The district court did not err in finding that this was a brief daytime interview in James's own home conducted by two plainclothes agents in calm, conversational tones, with no show of force, no crowding of James's personal space, and repeated assurances that the agents only wanted to have a conversation and that James would not be arrested that day. Nor does the record contradict the district court's finding that James conducted himself as would someone in control of the encounter; he took a phone call from his mother, declined one from his father after saying that "I can call him later," sometimes interrupted agents and anticipated their questions, and directed what the agents could disclose to his parents. Those are the hallmarks of an environment in which a reasonable person would perceive himself to have freedom of action. Moreover, "this court has explained that police encounters in a person's home typically do 'not rise to the kind of custodial situation that necessitates *Miranda* warnings,'" and here, James simply "fails to identify circumstances that transformed his home 'into an interrogation cell.'" *United States v. Fein*, 843 F. App'x 765, 771 (6th Cir. 2021) (quoting *Panak*, 552 F.3d at 465–66). To conclude otherwise would convert every routine in-home knock-and-talk into *Miranda* custody.

James counters that, because he told the agents that he had an unspecified psychological condition, the district court should have considered whether that condition impacted his perception that he was free to terminate the encounter. The district court, however, found no evidence of a

5

significant impairment from mental illness or any other source. Nor does James present any evidence of impairments to his agency. Because the audio recording of James's interview shows him instead to be a cogent, articulate adult exhibiting little more than the anxiety typical of an encounter with federal agents regarding this subject matter, the court's finding is not clearly erroneous. James's argument thus amounts to a request that we reweigh evidence. James's brief reference to unspecified "mental health problems" and memory lapses, without providing a specific diagnosis or any further information, is not the type of information that "generates commonsense conclusions about behavior and perception" that could change the objective assessment of his agency in freely consenting. *J.D.B. v. North Carolina*, 564 U.S. 261, 272–74 (2011) (citation modified); *see also Yarborough v. Alvarado,* 541 U.S. 652, 667–68 (2004).

## B. Scope of Consent

James next argues that evidence derived from the government's full search of his phone must be suppressed because the search exceeded the scope of his consent, which he claims was limited to the Whisper app. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Start with the initial in-home search of James's entire phone. In this context, it is not clearly erroneous to find that a form authorizing a "complete search" indeed authorizes a complete search. This form, consisting of four short declarative sentences, one of which tells the signer that he may refuse to sign, is not a trap for the unwary. James did not expressly narrow the form's broad authorization during the rest of the encounter or object to anything that the agents did on his phone.

In fact, James informed the agents that he had another application on his phone, Mega, and provided his password so that the agents could access it. Moreover, no one stated or implied that the form was mere boilerplate and that the "real" search was intended to be narrower. In short, nothing in this record manifestly displaces the plain text of the authorization. Under clear-error review, that is more than enough to affirm.

Next we turn to the off-site search. James's reliance on *United States v. Lewis*, 81 F.4th 640 (6th Cir. 2023), to argue for suppression of the forensic-search evidence is misplaced. There, we affirmed under clear-error review a district court's determination that the defendant's consent did not extend beyond an on-site review of his devices to their later seizure and forensic examination. *Id*. at 653. On that record, there was no evidence that the defendant had also consented to a *seizure* when he signed a form authorizing a "complete *search*" of his "premises, property or vehicle." *Ibid*. (emphasis added). Law enforcement expressed a similar understanding. One officer indicated to the defendant that the initial in-home search had concluded and that a warrant would be required for further analysis. *Ibid*. The officer likewise testified that he understood the defendant's consent to permit only an initial in-home "preview" of the contents of the devices. *Ibid*. Here, by contrast, a written consent form expressly authorized a "complete search" *and* seizure of the device, and nothing in the recording or in the officers' conduct or testimony points unmistakably to a reasonable understanding that the search was limited or had concluded. Given these facts, the district court did not clearly err when it took a competent adult who signed a plain-English authorization at his word.

**AFFIRMED**.